**CERA LLP**
Solomon B. Cera (SBN 099467)
Pamela A. Markert (SBN 203780)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&C RETAIL, INC., On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALTRIA GROUP, INC., ALTRIA ENTERPRISES LLC and JUUL LABS, INC.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL AND STATE ANTITRUST LAWS**<br><br>**JURY TRIAL DEMANDED** |

1

## <u>TABLE OF CONTENTS</u>

2

**Page(s)**

3

4

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE .......................................................................... 4

5

III.    INTRADISTRICT ASSIGNMENT..................................................................... 5

6

IV.     PARTIES ............................................................................................................. 6

7

V.      AGENTS AND CO-CONSPIRATORS .............................................................. 7

8

VI.     FACTUAL ALLEGATIONS............................................................................... 7

9

        A.      Development of E-Cigarettes And The Domination of JUUL ................ 7

10

        B.      Juul's and Altria's 2018 Negotiations And The Resultant Non-Compete
                Agreement ............................................................................................. 12

11

12

        C.      JUUL's Regulatory Problems And Altria's Responses. ....................... 16

13

VII.    CLASS ACTION ALLEGATIONS ................................................................... 19

14

VIII.   CLAIMS FOR RELIEF ..................................................................................... 22

15

FIRST CLAIM FOR RELIEF
Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3

16

(On Behalf of the Nationwide Class for Injunctive Relief) ........................................... 22

17

SECOND CLAIM FOR RELIEF
Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 Against Juul

18

(On Behalf of the Nationwide Class for Injunctive Relief) ........................................... 23

19

THIRD CLAIM FOR RELIEF
Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. §2)

20

(Attempted Monopolization Against Juul)

21

(On Behalf of the Nationwide Class for Injunctive Relief) ........................................... 24

22

FOURTH CLAIM FOR RELIEF
Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)

23

(On Behalf of the Nationwide Class for Injunctive Relief) ........................................... 24

24

FIFTH CLAIM FOR RELIEF
Violation of California Antitrust Statutes

25

(On behalf of the Nationwide Class and the California State Class for Damages)........................ 25

26

SIXTH CLAIM FOR RELIEF
Violation of California Consumer Protection Statutes

27

(On behalf of the Nationwide Class and the California State Class for Damages)........................ 27

28

1

2

SEVENTH CLAIM FOR RELIEF
Violation of State Antitrust Statutes
(On behalf of Each State Class for Damages)................................................................................ 29

EIGHTH CLAIM FOR RELIEF
Unjust Enrichment
(On Behalf of Each State Class for Damages) ............................................................................ 31

IX.      PRAYER FOR RELIEF......................................................................................... 32

X.       JURY TRIAL DEMANDED ................................................................................. 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B&C Retail, Inc. ("Plaintiff"), individually and on behalf of all persons in the United States which indirectly purchased Juul e-cigarettes for resale alleges the following against Defendants Altria Group, Inc., Altria Enterprises LLC ("Altria") and Juul Labs, Inc. ("Juul") for damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I. __INTRODUCTION__

1.      This class action involves agreements among horizontal competitors Juul and Altria to eliminate competition by Altria in the market for closed system electronic cigarettes ("e-cigarettes") (as defined below) in exchange for transferring to Altria a partial ownership interest in JUUL. These agreements effectuated a horizontal allocation of the market. JUUL and Altria agreed that the latter would exit the e-cigarette market entirely and instead become a minority shareholder in JUUL. This conduct constitutes a per se violation of Sections 1 and 3 of the Sherman Act and constituted an unlawful acquisition in violation of Section 7 of the Clayton Act. The agreements also provide the basis for the claims that JUUL attempted to monopolize and monopolized the relevant market of e-cigarettes sold in the United States and its territories in violation of Section 2 of the Sherman Act and violated state Antitrust and consumer protection laws. This claim is not based on circumstantial evidence, but is based on written agreements among the Defendants—the "Relationship Agreement", dated December 20, 2018; the "Amended Relationship Agreement," dated January 28, 2020;and a commitment letter from Altria to JUUL, dated October 5, 2018—that contained unequivocal non-compete provisions. On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint ("FTC Complaint") challenging the lawfulness of both the agreement and the acquisition under Section 5 of the FTC Act (15 U.S.C. §45) and noting that the conduct in question violates Section 1 of the Sherman Act and Section 7 of the Clayton Act *Federal Trade Comm'n v. Altria Group, Inc. et al. Dkt No.* 9393 (F.T.C. April 1, 2020).

2.      JUUL's e-cigarette consists of three components: (a) a flat, rectangular device consisting of an aluminum shell, a battery, a magnet (for the USB charger), a circuit board, an LED light, and a pressure sensor; (b) a USB charger; and (c) a pre-filled, non-reusable e-liquid cartridge (known as a "JUULpod") that serves as a mouthpiece and contains a fixed concentration of nicotine

mixed with flavoring and other additives that mimics the ability of a cigarette to deliver nicotine to the human brain. The e-liquid formula ("JUULsalts") is proprietary, contains high levels of nicotine (0.7 mL or 59 mg/mL per pod), and is based on nicotine salts found in leaf-based tobacco, rather than free-based nicotine. The system can deliver a nicotine peak in five minutes, which compares favorably with traditional combustible cigarettes. Use of the loaded device creates a vapor, which is why use of a JUUL system is known as "vaping". The system is a closed one in the sense that it is not modifiable. Since its entry into the e-cigarette market in June of 2015, JUUL quickly became the market leader, obtaining a 75% share by October of 2018.

3.      The Altria Group was known until 2003 as Philip Morris Companies, Inc. and is the leading manufacturer of traditional combustible cigarettes in the United States and its territories. Considering the public outcry against and litigation concerning traditional cigarette use, it has expanded into related markets such as smokeless tobacco, cigars, and pipes, always attempting to obtain a dominant position. It entered the e-cigarette market in 2013, when its subsidiary NuMark began trials of the MarkTen e-cigarette. The product was launched nationally in July of 2014 and was relatively successful. The Altria Group added to its e-cigarette portfolio by acquiring Green Smoke Inc. for nearly $110 million in cash and $20 million in incentive payments in April of 2014. And in February of 2018, it introduced the MarkTen Elite, a pod- based closed system e-cigarette that resembled JUUL's product in both appearance and structure. At one point, the Altria Group had a 16% share of the e-cigarette market, but its share had declined by mid-2018.

4.      The former CEO of the Altria Group, Marty Barrington, explained the rationale for his company's investment in e-cigarettes during a Consumer Analyst Group of New York conference held on February 21, 2018: "[W]e knew the industry was evolving and adult tobacco consumers were seeking less harmful alternatives to combustible cigarettes. Preparing for this opportunity, we've spent years acquiring best-in-class regulatory and product development talent and building a compelling portfolio of non-combustible tobacco products with the potential to reduce risk. We've also relentlessly advocated for tobacco regulatory policy that supports bringing innovative reduced-risk products to market and enables manufacturers to communicate truthful information to consumers about those products. Happily, in July 2017, the U.S. Food & Drug

Administration (FDA or Agency) adopted this approach as official policy, with the stated goal to 'encourage innovative, less harmful and satisfying non-combustible products for adults who want or need nicotine.' We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products. The range of tobacco products available in the U.S. is diverse when compared to many international markets, and different product platforms appeal to different U.S. adult tobacco consumers. That's why we're taking a portfolio approach, focusing on the three most promising platforms for U.S. adult tobacco consumers: smokeless tobacco and oral nicotine-containing products, e-vapor and heated tobacco. You'll hear more about each in a moment. Our approach is clear: to maintain our leadership in combustible tobacco products while vigorously pursuing this innovation aspiration. Going forward, our strategies are to:

- Maximize income from our combustible tobacco businesses;
- Grow income over time with non-combustible tobacco products; and
- Manage our diverse income streams and strong balance sheet to deliver consistent financial performance over the long term."

5.     Seeing the success of JUUL, the Altria Group decided it wanted to buy JUUL and become the dominant market player, just as it was in the combustible cigarette market, where its Marlboro brand accounted for 40% of sales or in the smokeless tobacco market where the Altria Group has 55% of sales. It commenced negotiations with JUUL, which intensified in the summer of 2018. As explained in the FTC Complaint, JUUL insisted that a precondition for a purchase of a stake in the company was that the Altria Group exit the e-cigarette market. As the FTC put it in paragraph four of its complaint, "During negotiations, [JUUL] insisted, and Altria recognized, that Altria's exit from the e-cigarette market was a non- negotiable condition for any deal. When Altria sought to weaken or remove any obligation to exit that market, [JUUL] conveyed that any such attempt was completely unacceptable." The Altria Group accepted this condition in a letter to JUUL dated October 5, 2018, and began dismantling its e-cigarette operations, including pulling the MarkTen Elite products from the market.

6.     Negotiations resumed and an agreement was signed on December 20, 2018. The Altria Group acquired a 35% stake in JUUL for $12.8 billion. The agreement was reflected in a

number of separate agreements, including: (a) the actual "Purchase Agreement"; (b) a "Services Agreement", whereby the Altria Group committed to provide various support services to JUUL; an (c) "Intellectual Property Licensing Agreement", which the Altria Group described in a Form 8-K filed with the Securities & Exchange Commission as giving JUUL a "non-exclusive, royalty- free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field….";and (d) the aforementioned "Relationship Agreement." In the Form 8-K, the Altria Group specifically noted that: "The Relationship Agreement generally prohibits Altria from competing, or otherwise acquiring an interest in an entity competing, in the e-vapor business for a period of at least six years from Closing [of the transaction], extendable thereafter unless terminated by Altria. If another person were to acquire 40% or more of Altria's voting power, or 30% of Altria's voting power combined with contractual control of a majority of Altria's board of directors, that person would also be subject to certain non-compete obligations set forth in the Relationship Agreement."

7.    These provisions of the Relationship Agreement constitute a naked restraint of trade in the form of a market allocation between horizontal competitors. These provisions continued to be applied in the Amended Relationship Agreement entered by Altria and JUUL on January 28, 2020. Such agreements illegally restrained competition in violation of federal and state antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff was overcharged and sustained injury to their business and property. Plaintiff  and members of the proposed Classes were injured by the elimination of the Altria Group as a competitor in the closed e-cigarette market, paid supracompetitive prices for JUUL's e-cigarettes as a result, and were denied the benefits of competitive innovation that could have existed had the Altria Group stayed in the market as an independent competitor.

## II.    <u>JURISDICTION AND VENUE</u>

8.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26, to secure equitable and injunctive relief against Defendants for violating Section 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 and 3, and Section 7 of the Clayton Act, 15 US.C, § 18. Plaintiff also asserts claims for actual and exemplary damages pursuant to state antitrust,

unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law. This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Sections 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and 3, Section 7 of the Clayton Act, 15 US.C, § 18, and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367 because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because JUUL is located in the District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## III.    INTRADISTRICT ASSIGNMENT

9.    Pursuant to N.D. Cal. Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiff and/or members of the Classes in counties located within the Division and JUUL's principal place of business is located within this Division.

IV.    **PARTIES**

10.    Plaintiff B&C Retail, Inc. ("B&C"), is headquartered in Ventura, California, with locations in Morro Bay, California, Paso Robles, California, Fillmore, California and Ojai, California. B&C purchased JUUL e-cigarette products indirectly, for resale, during the Class Period. B&C was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

11.    Defendant JUUL is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California 94107. JUUL is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in net revenue in 2018. JUUL was initially a division of Pax Labs ("Pax"), a maker of vaporizers based in San Francisco. Pax was founded in 2007 by James Monsees ("Monsees") and Adam Bowen ("Bowen"), both graduates of the design program at Stanford University. Pax raised $13.9 billion in eight funding rounds from venture capitalists such as Fidelity Investment. JUUL's closed system e-cigarettes was introduced in June of 2015 and Bowen said it packed a "bigger punch" as compared to other e-cigarettes because it contained ten times as much nicotine. He said that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping. As its sales grew, Pax spun off the division and incorporated it as a separate company. JUUL sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. JUUL is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

12.    Defendant Altria Group is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia 22320. Prior to 2007, Altria Group also owned the international operations of Philip Morris. In 2007, the company decided to separate the firm's domestic and international operations. According to the Associated Press, the move removed "the international tobacco business from the legal and regulatory constraints facing its domestic counterpart, Philip Morris USA."

13.    Altria Group is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes.

14.    During the Class Period, the Altria Group sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States and its territories. The Altria Group is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement. As noted above, prior to those agreements, the Altria Group sold and marketed e-cigarettes under the brand names MarkTen and Green Smoke. In 2018, the Altria Group generated over $25.364 billion in worldwide net revenues.

15.    Defendant Altria Enterprises is a wholly owned subsidiary of the Altria Group and is located at 6601 West Broad Street, Richmond, Virginia 22320. Altria Enterprises is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

16.    Defendants Altria Group and Altria Enterprises are referred to collectively herein as "Altria."

## V.    AGENTS AND CO-CONSPIRATORS

17.    The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

18.    Defendants' agents operated under the authority and apparent authority of their principals. Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## VI.    FACTUAL ALLEGATIONS

### A.    Development of E-Cigarettes And The Domination of JUUL

19.    The e-cigarette market was initially populated in part by a group of conventional cigarette manufacturers—Altria, Imperial Tobacco Group plc ("Imperial Tobacco"), Japan

Tobacco International ("Japan Tobacco"), and British American Tobacco ("BAT")—who were trying to diversify from their regular cigarette business and by smaller companies like NJoy. NJoy entered the market in 2010, while the tobacco companies entered the market between 2011 and 2014, before JUUL arrived in mid-2015. By 2013, the e-cigarette business had revenues of $1.7 billion a year. The numbers increased exponentially when JUUL entered the market. The following chart, taken from a 2018 research article, shows the dollar sales of e-cigarettes by company from 2011–17 with respect to retail channels tracked by the A.C. Nielsen Company ("Nielsen"):



20.     As can be seen, by the fourth quarter of 2017, JUUL had more sales than any of its competitors, although Altria's sales numbers had been expanding. The market shares of competing traditional tobacco companies declined as a result of JUUL's entry and success. A 2018 research letter published in the Journal of the American Medical Association graphically depicts this development for the period from 2013–17:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21





22    21.    Other competitors in the market suffered setbacks that limited their ability to

23  compete. One example is NJoy, which had been a pioneer in the market. As described in the 8/27/18

24  N.Y. Times Article cited above: NJoy gambled on an e-cigarette that looked virtually identical to

25  a cigarette. It was a mistake, said Craig Weiss, the chief executive who pushed the so-called cigalike

26  strategy and now consults for Juul. As NJoy's fortunes flagged, he said he realized that people

27  didn't want a product that looked so much like a cigarette that it still left them with the stigma of

28  being a smoker. NJoy filed for Chapter 11 bankruptcy in 2016.

22.    Likewise, in April of 2018, R.J. Reynolds Vapor Co., a subsidiary of BAT, had to recall its Vuse Vibe Power Units used in its e-cigarettes because of overheating, which led to a supply disruption.

23.    By October of 2018, JUUL had obtained a substantial share of the e-cigarette market.

24.    In a February 11, 2019 presentation, an analyst at Wells Fargo Securities, LLC said that JUUL "re-ignited" the e-cigarette category and depicted its dominance in the following chart:



25.    Altria is the "MO" listed in this chart and it reflects the company's withdrawal from the market in late 2018 because of its non-compete agreement with JUUL.

26.    One critical factor for JUUL's success was its appeal to previous nonsmokers. JUUL's e-cigarette was designed to minimize the harshness of nicotine (the "throat hit"), while maximizing the nicotine impact, thus enabling users to use e-cigarettes more frequently, for longer periods of time.

27.    The Mississippi Presentation noted that it was the first e-cigarette that was "easy to use, maintain, and provide high levels of nicotine"; it was dubbed as the "iPhone of e-cigarettes". A starter pack had a retail price of $44.99 and a pack of four JUULpods cost $15.99. The presentation noted further that the device and the JUULpods were available "directly from JUUL

Labs, Inc., other online retailers, and at 12,000 convenience stores in the U.S." By 2019, according to published reports, JUUL products were sold in 100,000 stores nationwide in addition to its own online retail portal

28.    JUUL products were introduced with an assortment of flavors—Mango, Cool Mint, Virginia Tobacco, Cool Cucumber, Classic Menthol, Fruit Medley, Creme Brulee, Classic Tobacco.

29.    Another factor in the success of JUUL's product was the way in which it was marketed through, inter alia, social media like Twitter, Instagram, or YouTube.

30.    One study shows that the growth of JUUL was accompanied by Innovative marketing across a variety of new media platforms. The marketing of other major retail e-cigarette brands, at least in their early stages, relied heavily on either advertising on TV (*e.g.*, Blu and Njoy) or promotional expenditures to retailers and consumers (*e.g.*, Vuse and MarkTen), or both. However, JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market and promote its products. In addition to Twitter, JUUL was heavily marketed and promoted on Instagram and YouTube. Indeed, seven JUUL-related Instagram accounts amassed over a quarter million followers.

31.    Additionally, the number of JUUL-related YouTube videos exceeded 100,000 as of March 1, 2018 and engagement with the videos was high. In addition to Twitter, Instagram and YouTube, a recent study found more than 15,000 members discussed JUUL-related themes on Reddit.

32.    Thus, while a company like Altria used marketing techniques learned from its experience with the conventional cigarette industry, such as promotional expenditures to retailers and consumers that delivered price savings to customers (as reflected by the FTC's reference in paragraph 67 of its Complaint to Altria's implementation of a major campaign for shelf space in 2018 that involved slotting fees, retailer discounts, and fixture payments), JUUL favored the use of social media campaigns.

33.    As noted earlier, Altria did fight back with the MarkTen Elite, a slim electronic device with a rechargeable battery and prefilled pods that was similar to JUUL's system.

34.    Unlike JUUL's product, the MarkTen Elite was marketed with heavy promotional coupons. One advertisement indicated that a MarkTen Elite device and two pod packs could be purchased for as little as $5.99 and a battery and two pod packs could be purchased for $9.95. The non-compete agreement between Altria and JUUL ended to this price rivalry. This fact is significant because there is evidence that price differentials are important to consumers of e-cigarettes.

35.    JUUL also positioned its product as a healthy alternative to use of conventional cigarettes; in repeated press releases, it noted how sales of traditional cigarettes were declining while sales of its product were increasing.

**B.    Juul's and Altria's 2018 Negotiations And The Resultant Non-Compete Agreement**

36.    The negotiations between Altria and JUUL that led to the Relationship Agreement of December 20, 2018 were not publicly documented. JUUL is a private company and has minimal public reporting obligations. Altria only reported on the end result, as reflected in its aforementioned Form 8-K. The allegations that follow are therefore based on the disclosures in the FTC Complaint, which is partially redacted.

37.    As noted above, by the summer of 2018, JUUL had made it clear to Altria that the latter's acquisition of a stake in the former was conditioned on Altria's withdrawal from the e-cigarette market and discontinuance of its MarkTen Elite brand, which JUUL clearly perceived as a competitive threat. That position was communicated unequivocally by Tim Danaher, the former Chief Financial Officer ("CFO") of JUUL; Burns, its former CEO; and Riz Valani ("Valani"), a member of its Board of Directors. On July 30, 2018, Nick Pritzker ("Pritzker"), another member of JUUL's Board, sent Howard Willard ("Willard"), the CEO of the Altria Group who later retired in April of 2020, a draft term sheet for an agreement that incorporated this requirement.

38.    On August 1, 2018, Pritzker, Valani, Burns, Willard, and Billy Gifford, the Altria Group's CFO, met at the Park Hyatt Hotel in Washington, D.C. to discuss the term sheet; no lawyers for either company were permitted to attend. It was clear to Willard that Altria's exit from the e-cigarette market was a precondition to any deal with JUUL. Altria attempted unsuccessfully to modify this requirement in discussions held on August 5, 2018. Pritzker, Valani, and Burns

reiterated JUUL's position in a mark-up of the term sheet dated August 9, 2018. Valani repeated this blunt message in a meeting with Dinny (?) Devitre, a member of the Altria Group Board of Directors, on August 15, 2018.

39.    The negotiations stalled until Willard capitulated. He stated orally that he would accept this precondition and confirmed it in a letter to Pritzker, Valani, and Burns, dated October 5, 2018. On October 25, 2018, Altria announced that it was suspending its MarkTen Elite business, purportedly in deference to the FDA's concerns about e-cigarettes that attracted juvenile buyers.

40.    As a result, MarkTen Elite products were no longer available online and inventories in the hands of retailers would not be replenished. A few days later, Altria and JUUL agreed to the basic deal terms. On December 7, 2018, Altria announced that it was exiting the e-cigarette business entirely. On December 20, 2018, the Altria-JUUL agreements were finalized. In publicly announcing the deal, JUUL said in a press release:

> Today, we have been joined by an unlikely – and seemingly counterintuitive– investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission. We understand the controversy and skepticism that comes with an affiliation and partnership with the largest tobacco company in the US. We were skeptical as well. But over the course of the last several months we were convinced by actions, not words, that in fact this partnership could help accelerate our success switching adult smokers. We understand the doubt. We doubted as well. We made it very clear that any investment would need to meet demanding and specific criteria to ensure that they are committed to our mission.

41.    One of these criteria was that "an investor would have to allow JUUL to remain in control." The anticompetitive non-compete clause was not mentioned by JUUL. Article 3.1 of the Relationship Agreement between JUUL and Altria set forth the non-compete agreement. It reads, in relevant part:

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . .

42.     Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued.

43.     Article 3.2 further prohibited competition on an indirect basis.

44.     As noted above, the Relationship Agreement was amended on January 28, 2020. Contemporaneous analysts noted the potential anticompetitive aspects of what JUUL and Altria did in entering into the Relationship Agreement. In one 2019 article, it was stated:

This deal directly removes Altria as an independent competitor in the vaping market by terminating its sales of MarkTen. Before Juul entered the US vaping market, Nielsen data from mass market retail (eg, pharmacies and grocery stores) indicated that Altria had a 16% share and the four cigarette companies had a 72% combined share in 2015.

45.     By September 2018, Juul had 72% of the market (dollar value, 55% in units sold), while the share of Altria fell to 7% by July 2018 and combined cigarette firm shares fell to 25%. However, mass market retail was estimated to be 40% of the entire vaping market. Although information is limited on market shares in the vape shop or online consumer channels, cigarette manufacturers have generally not sold their vaping products in these sectors.

46.     The deal can also impede competition by Altria cooperating with rather than competing with Juul (*e.g.*, through inserts on the outside of Altria packages with coupons for Juul products and providing Altria customer lists for marketing purposes) to insure that those smoking Altria products (*e.g.*, Marlboro) switch to Juul rather than other e-cigarette companies' products. To the extent that brand loyalty is created for Juul products, new entrants will face greater barriers to market entry. In addition, Altria is likely to help Juul fight patent infringement cases.

47.     The FTC echoed some of these concerns in its Complaint. As the FTC noted in paragraph 62 of its Complaint, the effect of the JUUL-Altria agreement was to: (a)"eliminat[e] MarkTen products from the relevant market, thereby eliminating current and future price competition between [JUUL and Altria], in particular promotional activity to create awareness and drive sales"; (b) eliminate "current and future innovation competition" between the companies; and (c) eliminate "current and future competition between [JUUL and Altria] for shelf space at retailers through rebates and other incentives." All of these identified harms constitute injury to Plaintiff and members of the Classes. Altria acquired a 35% stake in JUUL for $12.8 billion. For this amount, Altria obtained one "observer" to JUUL's Board, at least until the FTC cleared the transaction, which it obviously has not.

48.     Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to JUUL, divided between Initial and Extended Services. The Initial Services included leasing convenience store shelf space to JUUL, regulatory consulting, and distribution support; the Extended Service included direct marketing support and sales services. Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint members to Juul's board.

49.     The Intellectual Property License Agreement grants Juul a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

50.     The Relationship Agreement constitutes a per se antitrust violation of Sections 1 and 3 of the Sherman Act, collusive conduct in violation of Section 2 of the Sherman Act, and violates state antirust, consumer protection and unjust enrichment laws. JUUL and Altria are separate companies; neither owned the other. No joint venture was created between them.

51.     Instead, they were horizontal competitors who agreed that one of them would exit the market.

**C.    JUUL's Regulatory Problems And Altria's Responses.**

52.     Even before the Altria-JUUL deal was finalized, JUUL was facing severe regulatory criticism for marketing its e-cigarette products to teenagers. In April of 2018, Dr. Scott Gottlieb ("Gottlieb") of the Food & Drug Administration ("FDA") announced a "Youth Tobacco Prevention Plan" that would close access to e-cigarettes by minors; he pointed to numerous illegal sales of JUUL products in this respect. In September of 2018, the FDA announced that it had undertaken the largest coordinated enforcement effort in its history issuing 1,300 warning letters or fines to retailers who sold JUUL and other e-cigarettes to minors as part of an "undercover blitz" of brick-and-mortar and online retailers. The agency also served JUUL and other manufacturers with document requests. JUUL reported providing the agency with more than 50,000 pages of documents. JUUL reacted to the FDA criticism. On November 3, 2018, it discontinued retail sales of its mango, cucumber, creme and fruit JUUL pods to third party retailers and instead limited the distribution of these products to JUUL's own online shop. That was not enough for the agency. On September 9, 2019, the FDA sent JUUL a warning letter that stated: "[b]ased on our review of the information described above, FDA has determined that JUUL adulterated its products under section 902(8) of the FD&CAct (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution." Thus, JUUL was accused of illegally selling its e-cigarettes. JUUL responded by first eliminating sales in the United States and its territories of its fruit-flavored JUULpods on October 17, 2019. Thereafter, JUUL eliminated sales of mint- flavored JUULpods on November 7, 2019, Gottlieb was also not pleased with Altria after it became a stakeholder in JUUL.

53.    On February 6, 2019, he wrote a letter to Willard of Altria saying Altria's plans for JUUL "contradict[ed] the commitments you made to the FDA in a meeting" held on October 18, 2018. He demanded another meeting and said that "[w]hen we meet, Altria should be prepared to explain how this acquisition affects the full range of representations you made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Altria, JUUL, and Gottlieb met in March of 2019, but Gottlieb was reported as saying that the meeting was "difficult" and that "he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul." The concurring statement of FTC Commissioners Chopra and Slaughter in support of the filing of the FTC Complaint cited above reached a similar conclusion:

54.    In October 2018, Altria publicly claimed that it was discontinuing its e-cigarette product due to concerns about youth vaping. This was a pretext, as it was simultaneously trying to strike a massive deal with JUUL. With Altria's MarkTen out of the market, basic economic logic suggests that JUUL could capture those sales and further dominate the market.

55.    The problems that JUUL and Altria had with the FDA were not the only ones they faced with regulators. In 2019, various states and municipalities began imposing bans on JUUL and/or vaping products.

56.    In light of this cascade of bad news, Altria reacted by flexing its muscle as a shareholder and precipitating the ouster of some of JUUL's management. In September of 2019, Burns resigned as JUUL's CEO, and was replaced by K.C. Crosthwaite ("Crosthwaite"), a Senior Vice-President of Altria Group who served as its Chief Growth Officer, had overseen Altria's entry into the e-cigarette market and was Altria's designated interim "observer" on JUUL's Board pursuant to the terms of the Relationship Agreement.

57.    Crosthwaite is in the process of revamping certain executive positions. In October of 2019, he brought in as JUUL's new chief regulatory officer Joe Murillo ("Murillo") of the Altria Group; Murillo was the head of regulations at the Altria Group and previously ran the e-cigarette side of its business.

58.     Altria also took the opportunity to revise some of its December 2018 agreements with JUUL. The Services Agreement, Voting Agreement, and Relationship Agreement between Altria and JUUL were amended on January 31, 2020. The FTC describes the amendments as follows in paragraphs 26–28 of its Complaint:

59.     Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to (1) appoint two (of 10 nine) JUUL directors; (2) nominate one (of three) [JUUL] independent directors; (3) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (4) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and [JUUL], *i.e.*, "Joint Litigation Matters"); and (5) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change [JUUL's] senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant [JUUL's] CEO (1) a board seat, (2) a seat on the Litigation Oversight Committee, and (3) a seat on the Litigation Subcommittee. The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if [JUUL] is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

60.     The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except as regards to Altria's provision of retail shelf space to [JUUL], which service terminates after March 31, 2020.

61.     On January 2, 2020, the agency adopted a policy that prioritized its enforcement efforts with respect to e-cigarettes. After considering harsh regulatory action, although prohibiting the marketing of certain electronic nicotine delivery systems ("ENDS") products, the FTC continues to permit JUUL to produce e-cigarettes.

62.     The guidance also states that, after May 12, 2020, the FDA intends to also prioritize enforcement against any ENDS products that continue to be sold and for which the manufacturers have not submitted a premarket application. For ENDS products other than those in the three groups

described above, if premarket applications are submitted by that date, the FDA intends to continue to exercise enforcement discretion for up to one year pending FDA review of the applications, unless there is a negative action by the FDA on such application or the product is authorized to be marketed by the FDA.

63.     Thus, the upshot of the FDA's guidance was that while it had the statutory power to force all e-cigarettes off the market as being sold illegally, it exercised its discretion not to do so and focused its enforcement authority on non-tobacco or non-menthol flavored e-cigarettes and e-cigarettes marketed to customers under the age of 21. JUUL had ceased selling fruit-flavored or mint-flavored e-cigarettes in October and November of 2019 and had modified its marketing policies so that it did not target persons under the age of 21. To this day, it continues to market e-cigarettes with Virginia Tobacco, Classic Tobacco, and Menthol flavoring. The FDA's notice makes it clear that it has no intention of banning outright the sale of these types of e-cigarettes. The agency will be requiring manufacturers to submit premarket applications for e-cigarettes pursuant to the Tobacco Control Act by May 12, 2020 and this requirement applies to e-cigarettes already being marketed, but the FDA made it clear that tobacco-flavored or menthol-flavored e-cigarettes not being marketed to people under the age of 21 will be subject to an informal grace period of up to one year while the applications are being considered. JUUL is on record as saying it will be filing a premarket application. So, there is no immediate danger of JUUL being "prohibited by federal law from selling vaping products in the United States for at least a year" and the non-compete clause contained in the Relationship Agreement between JUUL and Altria remains in full force and effect.

## VII.   CLASS ACTION ALLEGATIONS

64.     Plaintiff  brings this class action on behalf of itself and all others similarly situated under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking injunctive relief under Sections 1,  2  and 3 of the Sherman Act and Section 7 of the Clayton Act, and damages under California law, on behalf of the following class (the "Nationwide Class"):

> All businesses and entities in the United States that purchased e-cigarettes and/or pods indirectly from Juul for resale, from October 5, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

The following persons and entities are excluded from the Nationwide Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

65.    Plaintiff also brings this class action on behalf of itself and all others similarly situated under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages for violations of individual state laws, on behalf of separate classes (each, a "State Class"), consisting of businesses and entities in each state that purchased during the Class Period e-cigarettes and/or pods indirectly from Juul for resale, under the laws of the following states: Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin (the "Indirect Purchaser States"). The same persons and entities excluded from the Nationwide Class are excluded from each State Class.

66.    The Classes are sufficiently numerous. Plaintiff believes that the Classes are so numerous and widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many Plaintiff to bring individual claims and join them together.

67.    Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of the Classes.

68.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with indirect antitrust litigation on behalf of indirect purchasers.

69.    Questions of law and fact common to members of the Classes predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to all members of the Classes. Such generally applicable questions are inherent in Defendants' wrongful conduct.

70.    Questions of law and fact common to the Classes include:

    a.    whether the conduct alleged herein constitutes a violation of the federal antitrust laws;

    b.    whether the U.S. and various State markets for closed-system e-cigarettes constitutes a relevant market;

    c.    whether Defendants possess sufficient market power in the relevant market to cause anticompetitive effects;

    d.    whether Juul possesses monopoly power in the relevant market;

    e.    whether the conduct alleged herein caused anticompetitive effects in the relevant market(s);

    f.    whether Defendant JUUL monopolized the U.S. and various State markets for closed-system e-cigarettes;

    g.    whether Defendants' conduct, as alleged in this Complaint, caused Plaintiff and the Classes to pay supracompetitive prices for e-cigarettes and thereby suffer antitrust injury;

    h.    the appropriate injunctive relief for the Classes; and the appropriate measure of damages sustained by Plaintiff and other members of the Classes.

71.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

72.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

VIII.  **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3**

**(On Behalf of the Nationwide Class for Injunctive Relief)**

73.    Plaintiff repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

74.    Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of closed system e-cigarettes sold to purchasers in the United States and its territories.

75.    In particular, Defendants have combined and conspired to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

76.    These violations of Section 1 and 3 consisted of, inter alia: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL; (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

77.    Defendants' activities constitute a per se violation of Sections 1 of the Sherman Act.

78.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price, promotional activity, and innovation, reducing consumer choice, and allowing JUUL to raise,

1   maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States
2   and its territories. For this conduct, Plaintiff and members of the Class are entitled to receive treble
3   damages pursuant to 15 U.S.C. § 15.

4       79.    As reflected by the recent entry of Defendants into the Amended Relationship
5   Agreement, Defendants' unlawful conduct is ongoing and has not ceased. The present and future
6   conduct by Defendants creates irreparable injury to both the Plaintiff and the Class. Plaintiff and
7   the Class are therefore also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

8                          **SECOND CLAIM FOR RELIEF**

9   **Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 Against Juul**
10              **(On Behalf of the Nationwide Class for Injunctive Relief)**

11      80.    Plaintiff repeats and reasserts each of the allegations contained in the preceding
12  paragraphs as if fully set forth herein.

13      81.    At all times relevant to this action, Juul had monopoly power in the market for the
14  sale of closed-system e-cigarettes in the United States. Juul controls at least 75% of the relevant
15  market in the United States. Moreover, there are high barriers to entry in the market for closed-
16  system e-cigarettes, including both technological and regulatory barriers.

17      82.    Juul has engaged in exclusionary conduct designed to prevent competition on the
18  merits in the relevant market for closed system e-cigarettes, and thereby maintain and enhance their
19  monopoly position in that market.

20      83.    Juul's anticompetitive conduct has decreased price competition in the relevant
21  market, deprived consumers of free choice, and imposed antitrust price injury on wholesale
22  distributors and end user customers.

23      84.    There are no legitimate business or pro-competitive justifications for Defendants'
24  conduct and any purported legitimate business justifications are mere pretexts.

25      85.    Even if such a justification existed, any purported pro-competitive benefits can be
26  achieved through alternative means less restrictive of competition.

27      86.    If not enjoined, Juul will continue to engage in anticompetitive conduct that will
28  further injure wholesalers, end users, and competition.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

**(Attempted Monopolization Against Juul)**

**(On Behalf of the Nationwide Class for Injunctive Relief)**

87.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

88.     Juul has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the relevant e-cigarette market.

89.     Juul has willfully, knowingly, and with specific intent to do so, attempted to monopolize the relevant e-cigarette market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

90.     Juul's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant e-cigarette market.

91.     Juul's ongoing anticompetitive conduct presents a dangerous probability that it will succeed, to the extent it has not already, in its attempt to monopolize the relevant market.

92.     Plaintiff and members of the Classes are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Juul's unlawful conduct.

**FOURTH CLAIM FOR RELIEF**

**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**

**(On Behalf of the Nationwide Class for Injunctive Relief)**

93.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

94.     The merger transaction between Altria and Juul, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the United States market for closed system e-cigarettes.

95.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the class were injured in their business or property.

**FIFTH CLAIM FOR RELIEF**

**Violation of California Antitrust Statutes**

**(On behalf of the Nationwide Class and the California State Class for Damages)**

96.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

97.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

98.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

99.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

100.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. Id. at § 16726.

101.    At least as early as October 5, 2018, and continuing through at least the present, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices of such e-cigarettes.

102.    The contract, combination, or conspiracy consisted of an agreement among the Defendants to allocate the e-cigaretter market which had the effect of artificially raising and maintaining the prices of e-cigarettes.

103.   In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves during which they agreed to allocate the market for e-cigarettes.

104.   Defendants' anticompetitive, unfair acts described above were knowing and willful, and constituted violations or flagrant violations of the below-listed California antitrust statutes. Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, et seq.

105.   During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and/or maintain e-cigarettes prices at supracompetitive levels.

106.   The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and/or stabilize the prices of e-cigarettes.

107.   For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above.

108.   The combination and conspiracy alleged herein has had, inter alia, the following effects upon the commerce of California: (1) Price competition in the sale of e-cigarettes has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for e-cigarettes sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased e-cigarettes from entities who purchased e-cigarettes directly from Defendants have been deprived of the benefit of free and open competition.

109.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid

more for e-cigarettes than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

**SIXTH CLAIM FOR RELIEF**

**Violation of California Consumer Protection Statutes**

**(On behalf of the Nationwide Class and the California State Class for Damages)**

110.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

111.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

112.    During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above.

113.    During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers.

114.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

115.    The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not

1  limited to, the violations of Section 16720, et seq., of the California Business and Professions Code,

2  as set forth above.

3       116.    Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as

4  described above, whether or not in violation of Section 16720, et seq., of the California Business

5  and Professions Code, and whether or not concerted or independent acts, are otherwise unfair,

6  unconscionable, unlawful, or fraudulent.

7       117.    Defendants' acts or practices are unfair to purchasers of e-cigarettes in the State of

8  California within the meaning of Section 17200, California Business and Professions Code.

9       118.    Defendants' unlawful conduct had the following effects: (1) e-cigarettes price

10  competition was restrained, suppressed, and eliminated throughout California; (2) e-cigarettes

11  prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout

12  California; (3) Plaintiff and members of the classes who resided in California and/or purchased e-

13  cigarettes in California were deprived of free and open competition in California; and (4) Plaintiff

14  and members of the classes who resided in California and/or purchased e-cigarettes in California

15  paid supracompetitive, artificially inflated prices in California for e-cigarettes.

16       119.    Defendants' acts and practices are unlawful, fraudulent, or deceptive within the

17  meaning of Section 17200 of the California Business and Professions Code.

18       120.    Plaintiff and members of the classes are entitled to full restitution and/or

19  disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been

20  obtained by Defendants as a result of such business acts or practices.

21       121.    The illegal conduct alleged herein is continuing and there is no indication that

22  Defendants will not continue such activity into the future.

23       122.    The unlawful, fraudulent, deceptive, and unfair business practices of Defendants,

24  and each of them, as described above, have caused and continue to cause Plaintiff  and the members

25  of the classes to pay supracompetitive and artificially inflated prices for e-cigarettes. Plaintiff and

26  the members of the classes suffered injury in fact and lost money or property as a result of such

27  unfair competition.

28

1    123.    The conduct of Defendants as alleged in this Class Action Complaint violates

2    Section 17200 of the California Business and Professions Code.

3    124.    As alleged in this Class Action Complaint, Defendants have been unjustly enriched

4    as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff  and the

5    members of the Damages Class are accordingly entitled to equitable relief including restitution

6    and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

7    been obtained by Defendants as a result of such business practices, pursuant to the California

8    Business and Professions Code, Sections 17203 and 17204.

9    **SEVENTH CLAIM FOR RELIEF**

10    **Violation of State Antitrust Statutes**

11    **(On behalf of Each State Class for Damages)**

12    125.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

13    herein.

14    126.    At least as early as October 5, 2018 through and until the anticompetitive effects of

15    Defendants' unlawful conduct cease, the exact dates being unknown to Plaintiff, Defendants

16    entered into a continuing agreement, understanding, and conspiracy in restraint of trade allocate the

17    e-cigarette market and  to fix, raise, maintain, and/or stabilize at artificial and non-competitive

18    levels the prices of such PSPs.

19    127.    The contract, combination, or conspiracy consisted of an agreement among the

20    Defendants to allocate the e-cigarette market and to fix, raise, inflate, stabilize, and/or maintain

21    artificially supra-competitive prices for e-cigarettes.

22    128.    In formulating and effectuating this conspiracy, Defendants performed acts in

23    furtherance of the combination and conspiracy, including participating in meetings and

24    conversations among themselves during which they agreed to allocate the e-cigarette market which

25    had the effect of fixing, increasing, inflating, maintaining , and/or stabilizing prices paid by Plaintiff

26    and members of each State Class with respect to e-cigarettes sold in the United States.

27    129.    Defendants engaged in the actions described above for the purpose of carrying out

28    their unlawful agreements.

130.    Defendants' anticompetitive, unfair acts described above were knowing and willful, and constituted violations or flagrant violations of the below-listed state antitrust statutes.

131.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, et seq.; the District of Columbia Code Annotated §§ 28-4501, et seq.; 740 Illinois Compiled Statutes 10/1 et seq.; Iowa Code §§ 553.1, et seq.; Kansas Statutes Annotated, §§ 50-101, et seq.; Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 22 1101, et seq.; Minnesota Annotated Statutes §§ 325D.49, et seq.; Mississippi Code Annotated §§ 75-21-1, et seq.; Nebraska Revised Statutes §§ 59-801, et seq.; Nevada Revised Statutes Annotated §§ 598A.010, et seq.; New Hampshire Revised Statutes §§ 356:1, et seq.; New Mexico Statutes Annotated §§ 57-1-1, et seq.; New York General Business Laws §§ 340, et seq.; North Carolina General Statutes §§ 75-1, et seq.; North Dakota Century Code §§ 51-08.1-01, et seq.; Oregon Revised Statutes §§ 646.705, et seq.; Rhode Island General Laws §§ 6-36-4, et seq.; South Dakota Codified Laws §§ 37-1-3.1., et seq.; Tennessee Code Annotated §§ 47-25-101, et seq.; Utah Code Annotated §§ 76-10-911, et seq.; Vermont Stat. Ann. 9 §§ 2451, et seq.; West Virginia Code §§ 47-18-1, et seq.; and Wisconsin Statutes §§ 133.01, et seq.

132.    Plaintiff and members of each State Class have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and members of each State Class have paid more for e-cigarettes than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

133.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of each State Class.

134.    Accordingly, Plaintiff and the members of each State Class seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**EIGHTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(On Behalf of Each State Class for Damages)**

135.    Each Plaintiff repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein on behalf of the State Class in which he or she purchased closed-system e-cigarettes.

136.    Plaintiff purchased closed-system e-cigarettes within their States of residence during the Class Period. But for Defendants' conduct set forth herein, the price of closed- system e-cigarettes would have been lower, in an amount to be determined at trial.

137.    Defendants unlawfully overcharged Plaintiff and State Class members who made purchases of Defendants' closed-system e-cigarettes in their States of residence at prices that were more than they would have been but for Defendants' actions.

138.    Defendants have been enriched by revenue resulting from unlawful overcharges for Juul's closed-system e-cigarettes.

139.    Plaintiff and State Class members have been impoverished by the overcharges for Defendants' closed-system e-cigarettes resulting from Defendants' unlawful conduct.

140.    Defendants' enrichment and Plaintiff's impoverishment are connected.

141.    Defendants have paid no consideration to any other person for any benefits they received from Plaintiff and State Class members.

142.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiff's and Class members' impoverishment, because Plaintiff and State Class members paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiff and State Class members have no remedy at law.

IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)    Award Plaintiff and the Class damages in an amount to be determined at trial, plus interest in accordance with law;

(C)    Enter judgment against Defendant and in favor of Plaintiff and the Class;

(D)    Declare the agreements alleged herein invalid and unenforceable;

(E)    Grant injunctive relief that restores Defendants' incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in Juul, rescission of Altria's purchase of that stake, and/or any other relief;

(F)    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

(G)    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

X.    **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: June 11, 2020                     **CERA LLP**


By:  _____/s/Solomon B. Cera_____
                        Solomon B. Cera

*Attorneys for Plaintiff*